UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| AMERICAN NORTHWEST DISTRIBUTORS INC., | Case No. 2:22-cv-01265-TMC |
| Plaintiff, | ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION TO STRIKE EXPERT TESTIMONY |
| v. | |
| FOUR ROSES DISTILLERY LLC, | |
| Defendant. | |

Plaintiff American Northwest Distributors Inc. ("ANW") was the Washington distributor of Four Roses bourbon, produced by Defendant Four Roses Distillery LLC ("Four Roses"), for about five years from 2015–2020. In 2020, after a pattern of late payments from ANW, Four Roses terminated the distribution agreement and switched to a competitor, Young's Market Company, LLC ("Young's Market"). ANW went to arbitration with Young's Market, as provided for in Washington's statutes regulating liquor distribution, and the arbitrator awarded ANW what she found to be the fair market value of ANW's lost distribution rights.

After the arbitration, ANW sued Four Roses, claiming Four Roses had breached the parties' contract and interfered with ANW's other business relationships, causing ANW damages beyond what it received from Young's Market in arbitration. Four Roses counterclaimed for

invoices ANW had never paid.

Now before the Court are ANW's motion for partial summary judgment (Dkt. 79), Four Roses' motion for summary judgment (Dkt. 75), and Four Roses' motion to strike the testimony of ANW's damages expert, Neil Beaton (Dkt. 76). For the reasons discussed below, the Court GRANTS IN PART and DENIES IN PART ANW's motion for partial summary judgment and Four Roses' motion for summary judgment, and GRANTS IN PART and DENIES IN PART Four Roses' motion to strike the testimony of ANW's expert.

## I.   BACKGROUND

### A.   Four Roses and ANW's Distribution Agreement

Four Roses is a bourbon distillery based in Lawrenceburg, Kentucky, and ANW is a wholesale alcohol distributor with sales in Washington, Oregon, and Idaho. Dkt. 64 ¶ 1. Before 2015, Four Roses bourbon was distributed in Washington by Pilchuck Distributors, Inc. *See* Dkt. 77-2 at 2, 12; *see* Dkt. 81 ¶ 7. On July 3, 2015, ANW completed a purchase of Pilchuck's assets which included its right to distribute Four Roses bourbon in Washington. *See* Dkt. 77-2; Dkt. 77-3 at 2. Pilchuck and Four Roses did not have a formal, written distribution agreement. Dkt. 77-1 ¶ 3. Instead, Pilchuck would order bourbon from Four Roses with payment for each order being due to Four Roses thirty days after it invoiced Pilchuck. *Id*. ¶ 4. As part of ANW's purchase of Pilchuck's assets, Four Roses agreed to the assignment of Pilchuck's distribution rights to ANW. Dkt. 77-3. This "consent to assignment" stated in its entirety that:

> Four Roses Distillery LLC ("Manufacturer") acknowledges that Pilchuck Distributors, Inc. ("Pilchuck") is planning to sell certain of its assets (the "Sale") to American Northwest Distributors, Inc., ("ANW") on or about July 3, 2015. In connection therewith, Manufacturer hereby agrees that Pilchuck may, upon the closing of the Sale, assign all rights to distribute the spirits described in Schedule 1, attached hereto and incorporated herein by reference, to ANW ("Assignment"). Due to Manufacturer's need to periodically allocate its inventory, the Assignment shall not serve as a guarantee or commitment on the part of Manufacturer to have any or all of the products described in Schedule 1 available for sale to ANW at all

times.

*Id*. at 2. The incorporated schedule listed seven different bourbons produced by Four Roses. *Id*.

After the July 2015 assignment, ANW continued to purchase and distribute Four Roses bourbon in Washington the same way Pilchuck had done: ordering bourbon from Four Roses, receiving invoices for each shipment, and paying the invoices within thirty days of receipt. Dkt. 77-1 ¶ 5. This distribution relationship continued without any more formal written agreement. *Id*. ¶ 7.

**B.    ANW's Delinquent Payments Between 2018–2019 and Substantial Debts**

In May 2018, ANW missed payment on Four Roses' invoices. *See* Dkt. 77-5 at 6. Four Roses accounting staff sent multiple email requests for payment in May, June, and July 2018. *Id*. By August 22, ANW was delinquent on $112,081.50 owed to Four Roses. *Id*. at 5. On August 23, ANW's CEO, Anton Fedechkin Wright, spoke with a Four Roses regional sales manager asking to revise their payment terms—from payment within thirty days of invoicing to sixty days of invoicing. *See id*. at 2–3. The Four Roses sales manager raised the request with their CFO, who was "unwilling to budge from the 30 day terms" of payment. *Id*. at 3. After being informed that payment deadlines would remain within thirty days of invoicing, Wright expressed concern that the "accounting stand off" could hurt business between the companies. *Id*. at 2. Four Roses stated that business would be unaffected as long as payments got "back on track." *Id*.

Four Roses later extended its payment deadline for ANW to forty-five instead of thirty days. *See* Dkt. 77-6 at 3, 12 ("Our terms are actually 30 days and ANW requested 60 days so we split the difference with you all to 45 days."). By November 2018, however, ANW was delinquent on $55,720.00 due "past the agreed terms." *Id*. at 12. Between November 2018 and March 2019, ANW continued to be delinquent on payments where it would initiate wire transfers to Four Roses days after reminders that payments were past their due dates, resulting in holds on

shipments of Four Roses bourbon to ANW. *See* Dkt. 77-6 at 3–12; Dkt. 77-10 at 2–6. Over this five-month period, ANW was late on payments ranging from $12,186.00 to $137,320.00. *Id.*

On March 22, 2019, Wright told ANW's controller, Kelly McBride, that with regard to the forty-five day payment window, "it is crucial that [ANW] stay[s] within terms for our spirits suppliers." *Id*. at 2. Wright also asked McBride what was preventing her "from getting rid of this problem" of delinquent payments, "and sending the wire[s] literally just one day ahead" of their due dates. *Id*. Wright told McBride to make it her "top priority" to pay ANW's "top spirits vendors on time and within their requested terms" and that he did not want any further shipment holds from Four Roses. *Id*. McBride testified at her deposition that ANW's payment delays were due to frequently lacking the funds to cover the required wire transfers or honor checks sent to ANW's alcohol suppliers—not limited to Four Roses. *See* Dkt. 77-4 at 3–4.

McBride also testified that in the summer of 2019, ANW received a line of credit for $1 million which allowed ANW to make on-time payments for two to three months. *See* Dkt. 77-4 at 4. On June 13, 2019, however, Four Roses placed another shipment hold on ANW's orders due to unpaid invoices. Dkt. 77-10 at 8. Another shipment hold occurred on September 13. *Id*. at 10–11. Around the same time, on June 5, Vineyard Brands—another supplier to ANW—reached out to Wright to express concern that over $1 million of its invoices to ANW were over two months overdue. Dkt. 77-19 at 6. Wright assured Vineyard Brands that ANW would provide a plan to "clear up older payments" that same week and characterized Vineyard Brands as ANW's "largest and most important supplier." *Id*. at 4. Similarly, in late September 2019, Wright called the Four Roses sales department to assure them that ANW had received "new financial backing" so that there "should no longer be any payment issues" for Four Roses. Dkt. 77-11 at 2.

On November 30, 2019, ANW generated and shared with Chase bank an accounts payable aging report (showing its short-term debts owed to vendors, suppliers, and creditors) that

showed approximately $1.6 million in payments between one and thirty days late, approximately

$740,000 between thirty and sixty days late, approximately $900,000 between sixty and ninety

days late, and approximately $590,000 over ninety days late. Dkt. 78 at 2, 4, 9.[1] In sum, ANW

was late on approximately $4.7 million of payments. *Id*. at 9.

**C.      ANW's 2020 Shipment Holds and Termination by Another Supplier**

By January 21, 2020, ANW was delinquent on $114,150.00 due to Four Roses since early

December 2019 (*see* Dkt. 77-13, 77-14), with another $28,053.00 due on January 25. Dkt. 77-12

at 3. Four Roses accounting staff notified Wright of the large outstanding balance, which ANW

then paid on January 22. *Id*. at 2. ANW then missed its January 25 payment and was placed on

another shipment hold. *Id*. Similarly, another supplier—Victoria Distillers—notified ANW on

January 15 that ANW was delinquent on approximately $36,000 in payments. Dkt. 77-28 at 3.

The same month, on January 17, one of ANW's suppliers—Black Sea Imports—terminated their

distribution relationship and directed ANW to discuss "appropriate compensation" with its

successor distributor. Dkt. 77-22 at 2.

**D.      Multiple Alcohol Suppliers Terminate ANW Amid High-Risk Business Assessment**

On March 25, 2020, Vineyard Brands notified ANW that it was terminating their

---

[1] The Court previously granted the parties' motion to seal Dkt. 78, 78-1, and 78-2. Some information from those sealed documents is discussed in this order, which will not be sealed or redacted. The Court finds that because this information is material to the Court's resolution of the dispositive motions, the public's interest in access to the judicial process outweighs the private interests in protecting that information from disclosure. *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006); *see Spam Arrest, LLC v. Replacements, Ltd.*, No. C12-481RAJ, 2013 WL 4478645, at *2 (W.D. Wash. Aug. 20, 2013) ("The court's reluctance to seal documents is at its height when the documents support a dispositive motion. Dispositive motions, like trials, are 'at the heart of the interest in ensuring the public's understanding of the judicial process and of significant public events.' A party must provide 'compelling reasons' for sealing any document associated with a dispositive motion. The court then balances those reasons against the competing public interests." (cleaned up, citing *Kamakana*, 447 F.3d at 1179) (concluding that information should be unsealed because it was critical to the court's resolution of pending summary judgment motions)).

distribution relationship, effective immediately. Dkt. 77-20. On March 31, a Dun & Bradstreet risk assessment of ANW purchased by Four Roses concluded there was high risk of business instability, higher than average risk of discontinued operations, and very high potential for delinquent payments at ANW and recommended no more than $30,000 of credit be extended to the business. Dkt. 77-30 at 2; *see* Dkt. 77-31 at 2. On April 2, Victoria Distillers notified ANW that it was also terminating their distribution relationship. Dkt. 77-21.

On April 8, 2020, in response to the beginning of the COVID-19 pandemic and downturn in retail alcohol sales, Wright distributed a letter to ANW's suppliers stating that ANW was expecting "Paycheck Protection Program and other government assistance" to provide "additional liquidity" for the business to survive. Dkt. 77-16. On April 23, another supplier— Samson & Surrey—terminated its distribution relationship with ANW. Dkt. 77-23. By April 26, Dun & Bradstreet decreased its maximum credit recommendation for ANW to $15,000 and reiterated that there were significant stability concerns at the business. Dkt. 77-30 at 12.

In late April 2020, ANW threatened to sue Victoria Distillers over its termination of their distribution relationship. *See* Dkt. 77-29 at 1, 4. Victoria Distillers responded that, among other things, ANW's "ongoing and unacceptable late payments" violated "agreed payment terms between the parties" and warranted good cause for termination. *Id*. at 4. Similarly, in May 2020, after Vineyard Brands terminated their distribution relationship, ANW claimed it was owed approximately $80,000. Dkt. 77-26 at 2. Vineyard's CFO responded that ANW's accounting was incorrect and stated that it was "extremely well documented and incredibly clear" that ANW's accounting records could not be trusted. *Id*.

**E.    Four Roses Terminates ANW and ANW Receives Arbitral Award from Successor**

On June 1, 2020, Four Roses notified ANW that it was terminating their distribution relationship, effective immediately. Dkt. 77-32 at 2. Four Roses had prepared an internal

proposal to transfer its Washington distribution from ANW to another alcohol distributor, Young's Market Company, LLC, citing ANW's repetitive late payments since early 2018, potential financial instability based on Dun & Bradstreet's risk assessments and the COVID-19 pandemic, and ANW's loss of distribution rights to a major supplier as problems that could be resolved by switching Four Roses' distribution to Young's Market. *See* Dkt. 77-31 at 2.

On July 10, 2020, ANW served Young's Market with a demand for arbitration for the fair market value of ANW's lost distribution rights, because Young's Market succeeded ANW as Four Roses' Washington distributor. Dkt. 77-33 at 2, 4. ANW initially demanded $6 million from Young's Market as the fair market value of distribution rights, while Young's Market offered approximately $1.5 million. Dkt. 77-34 at 3. The arbitrator rejected both ANW's initial expert report estimating up to $4.7 million as the fair market value of ANW's lost distribution rights and Young's Market's expert estimate of approximately $1.4 million. *Id.* at 6. The arbitrator stated ANW's estimates, even after revision for incorrect state sales fees and overly high growth rates, were still "too optimistic" and ultimately awarded ANW the revised estimate of fair market value calculated by Young's Market's expert of $1,944,390. *Id.* at 7, 10.

The following month, on August 31, another supplier—21Seeds Tequila—terminated its distribution relationship with ANW. Dkt. 77-24. Then, on January 22, 2021, an Avelada wine supplier terminated its distribution relationship with ANW. Dkt. 77-40.

## F.   Four Roses Denies ANW's Request to Restart Distribution Relationship

In June 2021, Wright reached out to the Four Roses sales team asking if they would consider switching back Washington distribution to ANW. *See* Dkt. 77-35 at 4–5. When Four Roses declined to reconsider, Wright prepared a draft email on July 21 to Four Roses which stated ANW maintained it was "wrongfully terminated," "Four Roses was notified of its violation of the laws of Washington and ignored the warning," and gave Four Roses until the end

of July "for a good will negotiation" regarding distribution rights. *Id*. at 2.

## G.   ANW Sues Four Roses

Over a year later, on August 8, 2022, ANW sued Four Roses in King County Superior Court, claiming Four Roses had breached its contract for distribution with ANW due to insufficient notice, violated RCW 19.126 *et seq*, tortiously interfered with ANW's relationships with other alcohol suppliers, and breached its covenant of good faith and fair dealing with ANW. Dkt. 1-1. Four Roses timely removed the case to this Court and counterclaimed for invoices that ANW had never paid. Dkt. 1, 24. After the parties completed discovery, Four Roses moved for summary judgment (Dkt. 75) and to strike the testimony of ANW's damages expert (Dkt. 76). ANW moved for partial summary judgment asking the Court to rule that (1) the parties had an agreement of distributorship and (2) Four Roses breached that agreement in violation of RCW 19.126.040. Dkt. 79. The Court held oral argument on the summary judgment motions. Dkt. 101. The motions are fully briefed and ripe for determination. Dkt. 87, 88, 90, 96, 97, 98.

## II.   LEGAL STANDARDS ON SUMMARY JUDGMENT

## A.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The evidence relied upon by the nonmoving party must be able to be "presented in a form

that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.").

Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be "presume[d]." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). However, as stated, "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). Consequently, "a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan*, 497 U.S. at 888 (internal quotations omitted).

**B.      Washington Law Governing Liquor Distributors and Suppliers**

> *1.      Agreements Between Distributors and Suppliers*

Washington's Wholesale Distributors and Suppliers of Spirits or Malt Beverages act defines distribution agreements, i.e. any "agreement of distributorship," as "any contract, agreement, commercial relationship, license, association, or any other arrangement, for a definite or indefinite period, between a supplier and distributor." RCW 19.126.020(1). Agreements of distributorship "must be in writing." RCW 19.126.040(1); *see also* RCW 19.126.030(1). Any such agreement between a distributor and supplier incorporates the protections enumerated in RCW 19.126.040 unless explicitly stated otherwise. *See* RCW 19.126.040; *see City Beverages,*

*LLC v. Crown Imports, LLC*, No. 23-35010, 2023 WL 4637113, at *1–2 (9th Cir. July 20, 2023) ("Although the text of the Act does not expressly state that suppliers always have the right to terminate distribution agreements without cause, it clearly allows a supplier to contract for that right.").

### 2. Termination of Agreements of Distributorship under RCW 19.126.040

Under RCW 19.126.040(2), suppliers must give written notice at least sixty days before terminating any agreements of distributorship and state "all the reasons for the intended termination or cancellation." Suppliers may terminate agreements without notice, however, if the termination is based on certain enumerated reasons. A supplier may terminate without notice if its distributor has (among other reasons) engaged in fraud, lost its license, or is insolvent. RCW 19.126.040(2) (referring to RCW 19.126.030(5)). "Legislative definitions provided in a statute are controlling, but in the absence of a statutory definition, courts may give a term its plain and ordinary meaning by reference to a standard dictionary." *Fraternal Ord. of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Ord. of Eagles*, 148 Wn.2d 224, 239, 59 P.3d 655 (Wash. 2002). In this case, the statute does not define "insolvent," so the Court refers to a standard dictionary which defines an insolvent entity as one "unable to pay debts as they fall due in the usual course of business" or "having liabilities in excess of a reasonable market value of assets held." *See Insolvent*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/insolvent (last visited Aug. 12, 2024).

### 3. Remedies for Violations of RCW 19.126.040

If an agreement of distributorship is "terminated, canceled, or not renewed for any reason other than for cause, failure to live up to the terms and conditions of the agreement, or a reason set forth in RCW 19.126.030(5)" the terminated distributor is "entitled to compensation from the successor distributor for the laid-in cost of inventory and for the fair market value of the

terminated distribution rights." RCW 19.126.040(4). A "successor distributor" is any distributor entering an agreement, "whether oral or written," to distribute spirits for a supplier who has "terminated, canceled or failed to renew an agreement of distributorship, whether oral or written, with another distributor." RCW 19.126.020(9). A terminated distributor may not receive total compensation under RCW 19.126.040(5) "that exceeds the fair market value" of its terminated distribution rights. *Id*. Fair market value is defined as "the amount that a willing buyer would pay and a willing seller would accept for such distribution rights when neither is acting under compulsion and both have knowledge of all facts material to the transaction" determined "as of the date on which the distribution rights" were terminated. RCW 19.126.040(6) (referring to RCW 19.126.040(4)).

RCW 19.126.040 is not, however, the sole and exclusive remedy available to terminated distributors. Rather, the statute's "limited scope demonstrates it created a cumulative remedy for distributors terminated without cause" and "coexist[s]" with common law remedies for breach of contract. *See Odom Corp. v. Pabst Brewing Co., LLC*, No. C17-5279-RBL, 2017 WL 2313491, at *5–8 (W.D. Wash. May 26, 2017).

**C.      Contract Formation and Remedies in Washington**

State law governs contract formation. *See, e.g., Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022). "The formation of a contract in Washington requires mutual assent to sufficiently definite terms, as well as consideration." *Id*. "Washington follows the objective manifestation theory of contract, which 'lays stress on the outward manifestation of assent made by each party to the other.'" *Id*. An implied contract can be formed when "a promise or set of promises" is implied "from an act or series of acts." *Plumbing Shop, Inc. v. Pitts*, 67 Wn.2d 514, 517, 408 P.2d 382 (1965). An implied contract "has no distinction from an express or written contract in terms of its legal consequences. It simply differs in the mode of its proof." *Id*.

Wrongful termination of a contract in Washington "may be fully remedied by a common law breach of contract claim." *DeBoer v. Pennington*, 287 F.3d 748, 750 (9th Cir. 2002).

**D.    Tortious Interference**

A claim for tortious interference with a contractual relationship requires five elements: (1) the existence of a valid contractual relationship; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage. *Nissen v. Lindquist*, No. C16-5093 BHS, 2018 WL 466598, at *4 (W.D. Wash. Jan. 18, 2018) (citing *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d 288 (Wash. 1997)).

**E.    Collateral Estoppel from Arbitration Proceedings**

"Issue preclusion . . . bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001)). "The doctrine of collateral estoppel, or issue preclusion, is grounded on the premise that once an issue has been resolved in a prior proceeding, there is no further fact-finding function to be performed." *Wabakken v. Cal. Dep't of Corrs. & Rehab.*, 801 F.3d 1143, 1148 (9th Cir. 2015) (internal quotations omitted).

Federal courts apply the collateral estoppel rules of their forum state. *See Jacobs v. CBS Broad., Inc.*, 291 F.3d 1173, 1177 (9th Cir. 2002). In Washington, an arbitration proceeding "may be the basis for collateral estoppel or issue preclusion." *Neff v. Allstate Ins. Co.*, 70 Wn. App. 796, 800, 855 P.2d 1223 (1993). For the doctrine of collateral estoppel to apply from an arbitration proceeding: (1) the arbitration must have determined identical issues and (2) issued a final judgment on the merits, (3) the party against whom collateral estoppel is asserted must have

been a party to or in privity with a party in the arbitration, and (4) the application of collateral estoppel must "not work an injustice on the party against whom the doctrine is to be applied." *Id.* (citing *Shoemaker v. Bremerton*, 109 Wn.2d 504, 507, 745 P.2d 858 (1987)).

A party is in privity with another when it "is in actual control" or "substantially participates in" the other party's proceeding or its interests are "adequately represented" therein. *Stevens Cnty. v. Futurewise*, 146 Wn. App. 493, 503, 192 P.3d 1 (2008). "Mere awareness of the proceedings is not sufficient to place a person in privity with a party to the prior proceeding." *Id.* at 504. The "injustice" factor of the collateral estoppel test "is generally concerned with procedural, not substantive irregularity." *Christensen v. Grant Cnty. Hosp. Dist. No. 1*, 152 Wn.2d 299, 309, 96 P.3d 957, (Wash. 2004). "This is consistent with the requirement that the party against whom the doctrine is asserted must have had a full and fair opportunity to litigate the issue in the first forum." *Id.*

### III.   SUMMARY JUDGMENT MOTIONS

**A.   Jurisdiction and Applicable Law**

The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and the opposing parties are citizens of different states. The parties dispute an amount in controversy between $313,910 and $9,205,500. *See, e.g.*, Dkt. 78-1 at 8; Dkt 78-2 at 26. ANW is a Washington corporation with its principal place of business in King County, Washington (Dkt. 1-1 at 4), while Four Roses is a single-member Delaware limited liability company with a principal place of business in Kentucky (*see* Dkt. 1-1 at 4; Dkt. 1 at 2). Four Roses' single LLC member is Kirin Beer & Spirits of America, Inc., a Delaware corporation with its principal place of business in Kentucky. *See* Dkt. 103 at 1; *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006) ("[A]n LLC is a citizen of every state of which its owners/members are citizens."). Accordingly, there is complete

diversity of citizenship between the opposing parties. Because the Court is sitting in diversity, substantive claims are governed by state law. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).

**B.**     **ANW's Motion for Partial Summary Judgment**

ANW asks the Court to rule that (1) ANW and Four Roses had an agreement of distributorship under RCW 19.126 *et seq*, (2) Four Roses breached RCW 19.126.040 and the parties' agreement of distributorship, and (3) Four Roses did not terminate its agreement with ANW because ANW was insolvent. *See* Dkt. 79 at 7–14. ANW also argues that Four Roses is collaterally estopped from claiming that ANW was terminated for insolvency because the issue was not raised as a defense in arbitration by the successor distributor, Young's Market. *See* Dkt. 87 at 14–16. The Court addresses each argument in turn.

> 1.     *ANW and Four Roses had an agreement of distributorship and implied contract under Washington law, and ANW can seek contract remedies against Four Roses.*

ANW asserts that its distribution relationship with Four Roses was "an agreement of distributorship" under RCW 19.126.020 and a contract that incorporated the terms and "protections" of RCW 19.126.040. *See* Dkt. 79 at 7. RCW 19.126.020(1) broadly defines "agreement of distributorship" as "any contract, agreement, commercial relationship . . . or any other arrangement, for a definite or indefinite period, between a supplier and distributor." Four Roses concedes that its distribution relationship with ANW was an "agreement of distributorship" under this broad definition but disputes that this was ever a "common law contract." Dkt. 90 at 9.

RCW 19.126.040(1) requires an agreement of distributorship to be in writing. And while certain terms of the parties' relationship were not memorialized in a formal contract, the parties did agree to the written Consent to Assignment when ANW purchased distribution rights to Four Roses products from its predecessor. *See* Dkt. 77-3. Four Roses acknowledged in the Consent

that distribution rights to its products were assigned to ANW. *See id*. at 2. After this assignment, the parties operated in a way that was sufficient to establish an implied contract, where "a promise or set of promises" is implied "from an act or series of acts." *Plumbing Shop*, 67 Wn.2d at 517. Between 2015 and 2020, ANW consistently and continually ordered bourbon from Four Roses while Four Roses continually shipped product to ANW after receiving payment. *See supra* Sec. I.A–E. While this distribution relationship continued without a formal written agreement, the parties recognized that certain "terms" were in place, such as a thirty-day payment deadline after ANW received invoices from Four Roses—later revised to be forty-five days. *See, e.g.,* Dkt. 77-6 at 3 ("Our terms are actually 30 days and ANW requested 60 days so we split the difference with you all to 45 days."). And ANW acted as the exclusive Washington distributor for Four Roses, which belies Four Roses' argument that the parties operated simply on a loose "purchase order basis." *See* Dkt. 75 at 3.

Agreements of distributorship incorporate the terms enumerated in RCW 19.126.040. *See* RCW 19.126.040 ("[D]istributors are entitled to the following protections which are deemed to be incorporated into every agreement of distributorship . . . ."). The inclusion of the language "incorporating" the statutory protections into distribution agreements shows the legislature's intent to supply a baseline of contractual terms between every supplier and distributor, even if— as is the case here—the parties did not enter a comprehensive written contract. The same analysis would apply to the "Suppliers' protections" set out in RCW 19.126.030. *See id.* ("Suppliers are entitled to the following protections with are deemed to be incorporated into every agreement of distributorship . . . ."). Although the parties may add to and perhaps contract around the statutory terms, *see City Beverages*, 2023 WL 4637113, at *1–2, the statute provides clear notice that the terms it supplies are the default position.

Because ANW and Four Roses did not agree to different terms, the parties' agreement of

distributorship (an implied contract) was subject to the statute's sixty-day notice requirement—a breach of which enables ANW to bring a common law contract claim. *See Caritas Servs., Inc. v. Dep't of Soc. & Health Servs.,* 123 Wn.2d 391, 404–07, 869 P.2d 28 (Wash. 1994) (holding that the incorporation of statutes into a contract renders them the same as other contractual terms, unless the contract provides otherwise). This Court agrees with Judge Leighton's analysis and conclusion in *Odom v. Pabst Brewing* that the statutory remedies provided in RCW 19.126.040 are not the sole remedies available to terminated distributors. The statute's "limited scope demonstrates it created a cumulative remedy for distributors terminated without cause" and "coexist[s]" with common law remedies for breach of contract. *See Odom*, 2017 WL 2313491, at *5–8. An implied contract "has no distinction from an express or written contract in terms of its legal consequences. It simply differs in the mode of its proof." *Plumbing Shop*, 67 Wn.2d at 517.

And where, as here, the parties' conduct created an implied contract, the allegedly wrongful contract termination "may be fully remedied by a common law breach of contract claim" in addition to the statutory remedies enumerated in RCW 19.126.040. *DeBoer*, 287 F.3d at 750; *Odom*, 2017 WL 2313491, at *5–8. Four Roses contends that the statute must be the exclusive remedy, but *Odom* persuasively rejected this proposition.

The *Odom* court reviewed RCW 19.126.040 for a clear exclusivity statement but concluded that the statute does not contain any language "abolishing" common law rights or otherwise stating it provides "exclusive remedies." Courts "hesitate to recognize an abrogation of . . . the common law absent an explicit statement or clear evidence that the legislature intended to make a statutory remedy exclusive." *Odom*, 2017 WL 2313491, at *5. Instead, the statute creates an additional statutory remedy for a particular situation—it "controls how a terminated distributor's inventory is treated and ensures that the distributor receives compensation for its lost distribution rights." *Id*. at *7. The Washington legislature gave no indication that it meant for

the statute to replace common law remedies for other types of damages. That the alleged breach here was of an implied rather than express written contract is a distinction without a difference.

>      2.      *Four Roses did not give sixty days notice of termination.*

On June 1, 2020, Four Roses notified ANW that it was terminating their distribution relationship, effective immediately. Dkt. 77-32 at 2. It is undisputed that Four Roses did not give ANW sixty days written notice of termination or an opportunity to cure any claimed deficiency. *See, e.g.,* Dkt. 79 at 10; Dkt. 90 at 2; *see also* RCW 19.126.040(2).

>      3.      *Genuine factual disputes remain as to whether ANW was insolvent at termination and whether Four Roses' termination of the agreement was based on ANW's insolvency.*

While RCW 19.126.040(2) requires suppliers to give at least sixty days prior written notice before terminating any agreements of distributorship, and to allow the distributor an opportunity to "rectify any claimed deficiency" in that time, *id.*, suppliers may terminate agreements without notice if "the reason for such termination is . . . insolvency." RCW 19.126.030(5). As discussed above, this term is also incorporated into the parties' contract. The statute does not define insolvency, but a business is generally understood to be "insolvent" when it is "unable to pay debts as they fall due in the usual course of business" or "ha[s] liabilities in excess of a reasonable market value of assets held." *See Insolvent*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/insolvent (last visited Aug. 12, 2024); *Fraternal Ord. of Eagles*, 148 Wash. 2d at 239. There remain genuine factual disputes as to whether ANW's insolvency was the reason Four Roses terminated its agreement of distributorship.

For example, before terminating its relationship with ANW, Four Roses had prepared an internal proposal to transfer distribution to Young's Market, which cited ANW's repetitive late payments since early 2018, potential financial instability based on Dun & Bradstreet's risk

1  assessments and the COVID-19 pandemic, and ANW's loss of distribution rights to a major

2  supplier as problems that could be resolved by changing distributors. *See* Dkt. 77-31 at 2. While

3  this is certainly evidence that supports Four Roses' contention that insolvency was the reason for

4  the termination, Four Roses did not actually cite these concerns—or any other reasons—in its

5  letter terminating the agreement, *see* Dkt. 77-32 at 2, even though under RCW 19.126.040(2),

6  suppliers must state "all the reasons for the intended termination or cancellation" when providing

7  notice to their distributors.

8       Similarly, while several other suppliers had terminated their distribution agreements with

9  ANW before Four Roses did (*see supra* Sec. I.D.), it remains unclear from the record whether

10  Four Roses was motivated by or aware of the cause of these other terminations. Victoria

11  Distillers, for example, only later stated that ANW's "ongoing and unacceptable late payments"

12  violated "agreed payment terms between the parties" that warranted good cause for termination.

13  *See* Dkt. 77-29 at 1, 4. And ANW introduces genuine factual questions regarding Four Roses'

14  motivation for termination by providing evidence that Four Roses' sales director joined from

15  Young's Market in December 2019 (Dkt. 80-2 at 2) and that this prior relationship may have

16  motivated changing Four Roses' Washington distribution over to Young's. *See* Dkt. 79 at 4–6.

17       ANW's accounts payable aging report showed in November 2019 that it was between

18  one and ninety days late on over $4 million of payments to its suppliers and vendors and over

19  ninety days late on approximately $590,000 in payments. Dkt. 78 at 2, 4, 9. But Four Roses has

20  not shown as a matter of law either that this financial condition equated to insolvency or that it

21  was the reason Four Roses terminated the distribution agreement in June 2020.

22       ANW's expert witness, Neil J. Beaton, concludes that the business was not insolvent,

23  Dkt. 80-7 at 19, and contests Four Roses' expert's opinion that "ANW fails the cash flow

24  solvency test; therefore, as of June 1, 2020 ANW was cash flow insolvent." Dkt. 80-6 at 19.

Beaton states that solvency determinations are difficult to make, Dkt. 80-7 at 8, and he points to ANW's ability to pay its debts through various methods during its distribution agreement with Four Roses. For example, Beaton notes that the company's annual financial statements showed available lines of credit ranging from $90,000 to $4.5 million between 2018 and 2022, of which some were paid off in full and others renewed by ANW's creditor banks. *Id*. at 9–10. Beaton testified that during the relevant time period, ANW could have drawn on these lines of credit to meet outstanding debts, held other various assets, and remained a profitable business between 2017 and 2022, excluding 2020—all of which meant the business was able to meet its debt obligations as they became due and that the value of the business continued to exceed its total liabilities. *See id*. at 11, 18.

While there is abundant evidence that ANW was frequently late on its payments to suppliers between 2018 and 2020, there remain genuine factual disputes—per conflicting expert testimony and documentary evidence—as to whether this meant ANW was unable to pay its debts in the "usual course of business," whether ANW's liabilities exceeded the fair market value of its assets, and whether ANW's financial condition was the actual reason Four Roses terminated its distribution agreement.

    4.    *Four Roses is not collaterally estopped from asserting ANW's insolvency.*

ANW argues in the alternative that Four Roses is collaterally estopped from arguing that insolvency was the basis for the termination because ANW's successor distributor failed to make this argument in arbitration. *See* Dkt. 87 at 14–16. While an arbitration proceeding "may be the basis for collateral estoppel or issue preclusion" under Washington law, *Neff*, 70 Wn. App. at 800, Four Roses is not precluded from arguing that ANW was insolvent by ANW's arbitration with Young's Market.

For collateral estoppel to apply, four elements must be met: (1) the arbitration determined identical issues and (2) issued a final judgment on the merits, (3) the party against whom collateral estoppel is asserted must have been a party to or in privity with a party in the arbitration, and (4) there were no procedural irregularities during arbitration such that the application of collateral estoppel would work an injustice. *Id.* A party is in privity with another when it "is in actual control" or "substantially participates in" the other party's proceeding or its interests were "adequately represented." *Futurewise*, 146 Wn. App. at 503. "Mere awareness of the proceedings is not sufficient to place a person in privity with a party to the prior proceeding." *Id.* at 504.

ANW's assertion of collateral estoppel fails to meet all four elements of the test. First, Young's Market did not allege ANW was insolvent at arbitration—so the question of insolvency was never actually decided on the merits. *See generally* Dkt. 77-34. Young's decision not to pursue that argument, for whatever reason, does not preclude Four Roses from making it now. Third, while ANW asserts that Four Roses was in privity with Young's Market during the arbitration, it does not analyze or otherwise show that Four Roses was in "control" or even participated in the arbitration, much less that its interests were adequately represented. *See* Dkt. 87 at 14–16; *Futurewise*, 146 Wn. App. at 503. Four Roses is not collaterally estopped from asserting that ANW's distribution agreement was terminated because of insolvency.

## C.    Four Roses' Motion for Summary Judgment

In its motion for summary judgment, Four Roses asks the Court to rule that: (1) ANW's claims under RCW 19.126.040 fail because it has recovered its statutory remedy, is barred from asserting claims against suppliers such as Four Roses, and lost its distribution rights due to insolvency; (2) ANW's contract claims fail as a matter of law; (3) ANW's tortious interference claim fails as a matter of law; and (4) ANW still owes Four Roses the balance of unpaid

invoices. *See* Dkt. 75 at 9–27. The Court addresses each argument in turn.

        1.    *ANW can still assert common law contract claims after its arbitral award.*

As discussed above in Section III.B.1., ANW is not barred from asserting common law breach of contract claims against Four Roses. RCW 19.126.040 supplies baseline contract terms for the parties' agreement—including a sixty-day notice of termination requirement that was not otherwise disclaimed in the parties' implied contract. And, as ANW clarified at oral argument, it is not asserting statutory claims against Four Roses under RCW 19.126.040, *et seq*, and is instead seeking breach of contract damages. Because the statutory remedy is cumulative of common law contract remedies, ANW can bring its contract claims against Four Roses in addition to the recovery it received in arbitration (Dkt. 77-34) against its successor distributor. *See* RCW 19.126.040(4)–(5); *see supra* Sec. III.B.1.

This does not mean, however, that ANW has any guarantee of fully recovering its claimed damages in this litigation. The parties contest, and there are genuine factual questions, as to how much of ANW's claimed damages overlap with the award received in arbitration. *Villiarimo*, 281 F.3d at 1061; *see* Dkt. 77-34. In arbitration, Beaton (the same expert for ANW in this case), ultimately opined that ANW should recover approximately $2.7 million as the fair market value of ANW's lost distribution rights. *See* Dkt. 77-34 at 10. Beaton's analysis relied on estimating and projecting ANW's profits from selling Four Roses' products, based on various factors such as population and market trends adjusted for what a "willing buyer" and "willing seller" would have agreed on as the price of the distribution rights in June 2020. *Id*. at 7.

In this case, Beaton's expert report conducts a similar analysis and estimates the profits ANW lost because it was no longer able to sell Four Roses' products. *See, e.g.*, Dkt. 77-42 at 14–26. Four Roses contends, and may argue at trial, that much of what ANW seeks would be a double recovery for the lost profits calculations underlying both its arbitral award and its

damages claim in this case. *See Rekhter v. State, Dep't of Soc. & Health Servs.*, 180 Wn.2d 102, 121, 323 P.3d 1036 (Wash. 2014) (holding that Washington courts have "consistently implemented rules designed to prevent double recoveries" to prevent "double redress for a single wrong").

> ### 2. *Genuine factual disputes remain regarding ANW's contract claims.*

Additionally, as discussed in Sections III.B.1. and III.C.1., the parties had at the very least an implied contract as their agreement of distributorship. This contract incorporated the baseline terms provided by RCW 19.126.030 and RCW 19.126.040. However, as discussed in Section III.B.3., there remain genuine questions of fact as to Four Roses' reasons for terminating the agreement and whether notice was required.

Similarly, regarding breach of contract damages, ANW has at least created a genuine factual dispute as to whether it suffered other damages in addition to the fair market value of distribution rights awarded in arbitration. *Odom* recognizes that a terminated distributor may suffer other losses such as "lost profits, reputational damages, or reliance damages." 2017 WL 2313491 at *7. So, while ANW's arbitral award may have accounted in part for lost profits as discussed in Section III.B.1., ANW's expert has presented at least some evidence that his lost profits analysis in this litigation encompasses a broader and more accurate range of data. *See* Dkt. 78-2 at 8 (stating that analysis included economic damages incurred after termination on June 1, 2020) *with* Dkt. 77-34 at 6 (providing experts' estimate of fair market value "as of June 1, 2020"). Accordingly, summary judgment is denied as to ANW's contract claims and claims regarding the parties' duty of good faith and fair dealing.

> ### 3. *ANW has failed to present evidence that Four Roses committed any tortious interference.*

Four Roses also moves for summary judgment on ANW's claim of tortious interference.

ANW's claim of tortious interference requires five elements: (1) the existence of valid contractual relationships; (2) that Four Roses had knowledge of those relationships; (3) Four Roses' intentional interference inducing or causing a breach or termination of those relationships; (4) that Four Roses interfered for an improper purpose or used improper means; and (5) resultant damage. *Nissen*, 2018 WL 466598, at *4.

ANW has not provided any evidence that Four Roses intended to interfere with ANW's other business relationships, and therefore no reasonable factfinder could find the critical intent element for tortious interference. *Id*. At most, ANW appears to contend that Four Roses' termination impacted its sales of non-Four Roses' products because its customers started to order less from ANW overall, but it provides no evidence beyond correlation. *See* Dkt. 77-42 at 18. This is not enough to show intent. The Court grants summary judgment to Four Roses on ANW's tortious interference claim.

> 4.    *ANW owes Four Roses the balance of unpaid invoices.*

ANW concedes that it never paid the invoices attached to Four Roses' counterclaim (Dkt. 24 at 110–11), despite receiving and selling the products invoiced. *See* Dkt. 26 ¶ 45; Dkt. 77-17 at 24–25. Accordingly, the Court grants summary judgment to Four Roses on the issue of ANW's unpaid invoices. Four Roses is entitled to $30,320, plus interest, due on the unpaid invoices. Dkt. 24 at 110–11.

## IV.    FOUR ROSES' MOTION TO STRIKE

Four Roses also moves to exclude the testimony of ANW's expert, Neil J. Beaton, regarding lost profits, related damages, and "convoyed sales." Dkt. 76 at 1. Four Roses asserts that Beaton's calculation of ANW's lost profits is "indistinguishable" from the fair market value opinion he offered regarding ANW's lost distribution rights during arbitration, in addition to being erroneous and speculative. *Id*. at 4. Four Roses also asserts that Beaton's testimony on

1   ANW's lost "convoyed sales" of other products should be excluded. *Id.* Because Four Roses'

2   arguments regarding Beaton's testimony go to weight rather than admissibility, the Court denies

3   the motion to strike, except as to his testimony on "convoyed sales." Beaton's convoyed sales

4   estimate relies on the assumption that Four Roses' conduct interfered with ANW's sales

5   relationships. Because summary judgment is granted in favor of Four Roses on ANW's claim of

6   tortious interference (*see supra* Sec. III.B.3.), Beaton's testimony on this issue is no longer

7   relevant and will be excluded.

8   **A.    Federal Rule of Evidence 702 and *Daubert***

9          Federal Rule of Evidence 702 governs the admissibility of expert testimony. Testimony is

10  permitted if it is both relevant and reliable. *Est. of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457,

11  463 (9th Cir. 2014) (en banc) (citing Fed. R. Evid. 702), *overruled on other grounds by United*

12  *States v. Bacon*, 979 F.3d 766 (9th Cir. 2020). Before trial, "[t]he trial court acts as a

13  'gatekeeper' to exclude expert testimony that" does not meet these standards. *Neal-Lomax v. Las*

14  *Vegas Metro. Police Dep't*, 574 F. Supp. 2d 1193, 1201 (D. Nev. 2008) (quoting *Kumho Tire*

15  *Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999)).

16         Expert testimony is relevant if it "will assist the trier of fact to understand the evidence or

17  to determine a fact in issue." *Daubert v. Merrell Dow Pharms., Inc. ("Daubert I")*, 509 U.S.

18  579, 589 (1993) (citing Fed. R. Evid. 702(a)); *see also Daubert v. Merrell Dow Pharmaceuticals*

19  *("Daubert II")*, 43 F.3d 1311, 1315 (9th Cir. 1995) (relevant evidence is that which "logically

20  advances a material aspect of the proposing party's case"), *cert. denied*, 516 U.S. 869 (1995).

21         Expert testimony is reliable if it is "based on sufficient facts or data," "is the product of

22  reliable principles and methods," and "reflects a reliable application of the principles and

23  methods to the facts of the case." Fed. R. Evid. 702(b, c, d). More generally, evidence is reliable

24  "if the knowledge underlying it 'has a reliable basis in the knowledge and experience of [the

relevant] discipline.'" *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)

(quoting *Kumho Tire*, 526 U.S. at 149). In *Daubert*, the Supreme Court set out several factors

that courts may consider in determining reliability:

> (1) whether a scientific theory or technique can be (and has been) tested;
> (2) whether the theory or technique has been subjected to peer review and
> publication; (3) the known or potential rate of error and the existence and
> maintenance of standards controlling the techniques operation; and (4) whether the
> technique is generally accepted.

*Neal-Lomax*, 574 F. Supp. 2d at 1201 (citing *Daubert I,* 509 U.S. at 593–94). However, these

factors do not constitute a "definitive checklist or test," *see Daubert I*, 509 U.S. at 593, and "[i]n

other cases, the relevant reliability concerns may focus upon personal knowledge or experience."

*Kumho Tire*, 526 U.S. at 150. Nor do the *Daubert* factors "necessarily apply even in every

instance in which the reliability of scientific testimony is challenged." *Id.* at 151. Rather, "[t]he

inquiry under Rule 702 is a 'flexible' one, and the district court has 'the discretionary

authority . . . to determine reliability in light of the particular facts and circumstances of the

particular case.'" *Youngevity Int'l v. Smith*, No.: 16-CV-704-BTM-JLB, 2019 WL 2918161, at

*12 (S.D. Cal. July 5, 2019) (quoting *Kumho Tire*, 526 U.S. at 158); *see also Hangarter v.

Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) ("[A] trial court not only

has broad latitude in determining whether an expert's testimony is reliable, but also in deciding

how to determine the testimony's reliability." (internal quotations omitted)).

"Generally, an inquiry under Rule 702 examines the expert's testimony as a whole."

*United States v. W. R. Grace*, 504 F.3d 745, 762 (9th Cir. 2007). The proponents of expert

testimony bear the burden of establishing its admissibility over the objections of the opposing

party by a preponderance of the evidence. *City of Seattle v. Monsanto Co.*, No. C16-107-RAJ-

MLP, 2023 WL 4014294, at *4 (W.D. Wash. June 15, 2023) (citing *Daubert I*, 509 U.S. at 592

n.10). District courts "must keep in mind Rule 702's broad parameters of reliability, relevancy,

1    and assistance to the trier of fact." *Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir.

2    1998) (internal quotations omitted).

3    **B.      Beaton's expert testimony is admissible.**

4          Four Roses first argues that Beaton's testimony regarding ANW's lost profits is

5    inadmissible because ANW cannot recover those profits as a matter of law, so that any testimony

6    on this issue is "not helpful to the trier of fact." Dkt. 76 at 4. As discussed above (*see* Sec. III.B–

7    C.), ANW may seek such recovery under common law contract claims and Four Roses'

8    argument on this point is unpersuasive. Four Roses also contends that Beaton's testimony is a

9    "rehash" of the damages he attested to in arbitration. *Id*. at 5. As discussed in Section III.C.1.,

10   however, while there may be overlap in Beaton's financial figures, there are genuine disputes

11   between the parties as to how that impacts the damages analysis in this case.

12         Four Roses also questions the reliability of Beaton's financial projections, asserting that

13   they are overly optimistic and lack "reasonable certainty." Dkt. 76 at 5–6 (for example, "Beaton

14   suggests that ANW's reasonable lost profits are more than double the amount of gross revenue

15   that ANW collected <u>during the parties' entire four-year relationship</u>"). While Beaton's

16   projections may be "optimistic," that does not make his testimony unreliable if he lays an

17   acceptable foundation for those calculations. *See W. R. Grace*, 504 F.3d at 762.

18         Beaton has disclosed his assumptions and methodology for projecting lost profits, and

19   Four Roses has not shown that those methods lack a reliable basis in the knowledge and

20   experience of Beaton's discipline. Four Roses can challenge Beaton's approach at trial, but his

21   choice of assumptions does not render his testimony inadmissible—only more or less persuasive

22   when evaluated as a whole.

23         The judge at arbitration took a similar approach, recognizing that Beaton held undeniable

24   expertise in business valuation—but the assumptions upon which he applied that expertise did

not lead to a persuasive conclusion. Dkt. 77-34 at 6–8 ("Both experts are reputable with extensive experience and backgrounds in business valuations . . . [but] neither expert was entirely persuasive . . . They used a somewhat similar methodology but differed significantly in how they evaluated the historical data and the factors."); *see Sandoval-Mendoza*, 472 F.3d at 654 (holding that evidence is generally reliable "if the knowledge underlying it 'has a reliable basis in the knowledge and experience of [the relevant] discipline.'").

Four Roses cites cases where purported experts gave conclusory testimony without any basis in data or independent verification (*see, e.g.*, *Fraud-Tech, Inc. v. ChoicePoint, Inc.,* 102 S.W.3d 366, 384–85 (Tex. Ct. App. 2003) (accepting management's conclusory market share estimates); *U.S. Salt, Inc. v. Broken Arrow, Inc.,* 563 F.3d 687, 691 (8th Cir. 2009) (accepting client's estimates without analysis)). Beaton's testimony is distinguishable in that it was derived from financial data with his own analysis.

As the judge at arbitration recognized, business valuation "is as much an art as a science." *see* Dkt. 77-34 at 7. Four Roses does not challenge Beaton's methods—it questions the growth assumptions and discretionary factors that are necessary to financial projections and challenges the figures he arrives at. *See generally* Dkt. 77-42, 80-7. This presents a factual dispute for trial. The Court has "broad latitude" in determining an expert's reliability and finds no reason to question the reliability or relevance of Beaton's testimony on lost profits under Rule 702. *Hangarter*, 373 F.3d at 1017; *Est. of Barabin*, 740 F.3d at 463.

Beaton's testimony regarding "convoyed sales," however, is no longer relevant, even if it could be considered reliable (an issue the Court need not decide). Beaton opines that ANW's sales of Four Roses products motivated its customers to buy more products overall—such that Four Roses' termination negatively impacted these purchases. *See* Dkt. 77-42 at 18–21. In light of the Court's determination, however, that Four Roses did not tortiously interfere with ANW's

other business relationships (*see supra* Sec. III.C.3.), Beaton's "convoyed sales" testimony is no longer relevant and will be excluded. *See Est. of Barabin*, 740 F.3d at 463.

## V.    CONCLUSION

For the reasons explained above, the Court GRANTS IN PART and DENIES IN PART ANW's motion for partial summary judgment (Dkt. 79), Four Roses' motion for summary judgment (Dkt. 75), and Four Roses' motion to strike the testimony of ANW's expert Neil J. Beaton (Dkt. 76).

The Court ORDERS as follows:

- ANW's motion for partial summary judgment asking the Court to rule that: (1) the parties had an agreement of distributorship under RCW 19.126.040 and (2) Four Roses did not provide sixty days notice for terminating that agreement, is GRANTED. Summary judgment is DENIED as to whether Four Roses breached the parties' contract.

- Four Roses' motion for summary judgment on (1) ANW's tortious interference claim and (2) Four Roses' counterclaim for unpaid invoices is GRANTED. Summary judgment is DENIED as to ANW's breach of contract claims.

- Four Roses' motion to strike the testimony of Neil J. Beaton is DENIED as to testimony regarding lost profits and other damages and GRANTED as to testimony regarding ANW's loss of "convoyed sales."

Dated this 20th day of August, 2024.

Tiffany M. Cartwright
United States District Judge